No. 25-1664

# In the United States Court of Appeals for the Eighth Circuit

BROOKLYN ROCKETT; KADAN ROCKETT,
*Plaintiffs–Appellees*,

v.

ERIC EIGHMY, IN HIS INDIVIDUAL CAPACITY ONLY,
*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Missouri
No. 6:21-cv-03152-MDH (Hon. M. Douglas Harpool)

**BRIEF OF AMICUS CURIAE INSTITUTE FOR JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLEES**

Dylan Moore
Anya Bidwell
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
dmoore@ij.org

Counsel for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Institute for Justice (IJ) states that it is a private, nonprofit civil liberties law firm. IJ is not a publicly held corporation and does not have any parent corporation. No publicly held corporation owns 10 percent or more of its stock. No publicly held corporation has a direct financial interest in the outcome of this litigation.

Dated: July 29, 2025

/s/ Dylan Moore
Dylan Moore

*Counsel for Amicus Curiae*
*Institute for Justice*

## TABLE OF CONTENTS


**Page**

INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 5

I. Qualified immunity does not shield officials from accountability for obvious constitutional violations .......... 5

A. Circuits disagree about whether defendants may invoke qualified immunity to escape accountability for egregious constitutional violations .......... 6

B. This Court should not expand qualified immunity to shield Judge Eighmy's obviously unconstitutional actions. .......... 10

II. Qualified immunity is indefensible as a matter of legal history .......... 12

A. Qualified immunity did not exist at common law .......... 13

B. Section 1983's Notwithstanding Clause confirms that the statute abrogates any state common-law immunities that applied before its enactment .......... 20

C. Congress's decision to remove the Notwithstanding Clause did not change the meaning of § 1983 .......... 24

CONCLUSION .......... 28

CERTIFICATE OF SERVICE .......... 30

CERTIFICATE OF COMPLIANCE .......... 31

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Anderson v. Creighton*,
483 U.S. 635 (1987) .......... 17

*Browder v. City of Albuquerque*,
787 F.3d 1076 (10th Cir. 2015) .......... 9, 12

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) .......... 14

*Civil Rights Cases*,
109 U.S. 3 (1883) .......... 26, 27

*Crawford-El v. Britton*,
523 U.S. 574 (1988) .......... 18

*Doe v. Aberdeen Sch. Dist.*,
42 F.4th 883 (8th Cir. 2022) .......... 3, 9

*Egbert v. Boule*,
596 U.S. 482 (2022) .......... 1

*Filarsky v. Delia*,
566 U.S. 377 (2012) .......... 14, 16

*Graham v. Connor*,
490 U.S. 386 (1989) .......... 10

*Gray ex rel. Alexander v. Bostic*,
458 F.3d 1295 (11th Cir. 2006) .......... 9

*Halley v. Huckaby*,
902 F.3d 1136 (10th Cir. 2018) .......... 9

*Hardwick v. County of Orange*,
844 F.3d 1112 (9th Cir. 2017) .......... 9

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......... *passim*

*Hope v. Pelzer*,
536 U.S. 730 (2002) ........................................................................ *passim*

*Johnson v. Phillips*,
664 F.3d 232 (8th Cir. 2011) ........................................................................ 11

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968) ........................................................................ 27

*Little v. Barreme*,
6 U.S. (2 Cranch) 170 (1804) ........................................................................ 15, 16

*Malley v. Briggs*,
475 U.S. 335 (1986) ........................................................................ 6

*Martin v. United States*,
145 S. Ct. 1689 (2025) ........................................................................ 1

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022) ........................................................................ 18

*McMurry v. Weaver*,
142 F.4th 292 (5th Cir. 2025) ........................................................................ 8

*Minnesota v. Dickerson*,
508 U.S. 366 (1993) ........................................................................ 10

*Myers v. Anderson*,
238 U.S. 368 (1915) ........................................................................ 23

*Peterson v. City of Plymouth*,
945 F.2d 1416 (8th Cir. 1991) ........................................................................ 10

*Pierson v. Ray*,
386 U.S. 547 (1967) ........................................................................ 6, 17

*Price v. Montgomery County*,
144 S. Ct. 2499 (2024) ........................................................................ 20

*Rehberg v. Paulk*,
566 U.S. 356 (2012) ........................................................................ 19

*Rockett v. Eighmy*,
71 F.4th 665 (8th Cir. 2023) .......... 2, 11

*Rogers v. Jarrett*,
63 F.4th 971 (5th Cir. 2023) .......... 4, 18

*Rosales v. Bradshaw*,
72 F.4th 1145 (10th Cir. 2023) .......... 3, 10

*Sause v. Bauer*,
585 U.S. 957 (2018) .......... 6

*Schneyder v. Smith*,
653 F.3d 313 (3d Cir. 2011) .......... 9

*Taylor v. Riojas*,
592 U.S. 7 (2020) .......... *passim*

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993) .......... 24

*United States v. Cline*,
27 F.4th 613 (8th Cir. 2022) .......... 28

*United States v. Ryder*,
110 U.S. 729 (1884) .......... 26

*Villarreal v. Alaniz*,
145 S. Ct. 368 (2024) .......... 7

*Villarreal v. City of Laredo*,
94 F.4th 374 (5th Cir. 2024) .......... 7, 8

*Villarreal v. City of Laredo*,
134 F.4th 273 (5th Cir. 2025) .......... 8, 12

*Wasson v. Mitchell*,
18 Iowa 153 (1864) .......... 14

*Wyatt v. Cole*,
504 U.S. 158 (1992) .......... 19

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 18

**Rules and Statutes**

42 U.S.C. § 1983 .......... 4, 13

Fed R. App. P. 29(a)(2) .......... 1

Fed. R. App. P. 29(a)(4)(E) .......... 1

74 Rev. Stat. § 5596 (1874) .......... 24

Act of June 27, 1866, ch. 140, § 1, 14 Stat. 74 .......... 25

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 .......... 4, 20

**Other Authorities**

2 Cong. Rec., 43d Cong., 1st Sess. 129 (1873) .......... 25

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,
111 Calif. L. Rev. 201 (2023) .......... *passim*

David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1 (1972) .......... 14

Institute for Justice, *50 Shades of Government Immunity* (Jan. 25, 2022) .......... 1

Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity*,
112 J. Crim. L. & Criminology 105 (2022) .......... *passim*

Patrick Jaicomo & Daniel Nelson, *Section 1983 (Still) Displaces Qualified Immunity*, 49 Harv. J.L. & Pub. Pol'y ____ (forthcoming 2026) .......... *passim*

Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741 (1987) .......... 23

William Baude, *Is Qualified Immunity Unlawful?*,
106 Calif. L. Rev. 45 (2018) .......... *passim*

## INTEREST OF AMICUS CURIAE[1]

The Institute for Justice is a nonprofit, public-interest law firm dedicated to protecting individual liberty. IJ has become one of the nation's leading advocates on doctrines that obstruct the enforcement of constitutional rights, including governmental immunity. As a result, IJ routinely litigates cases (*e.g.*, *Martin v. United States*, 145 S. Ct. 1689 (2025)), files amicus briefs (*e.g.*, Brief of Amicus Curiae Institute for Justice in Support of Respondent, *Egbert v. Boule*, 596 U.S. 482 (2022) (No. 21-147)), publishes scholarship (*e.g.*, Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity*, 112 J. Crim. L. & Criminology 105 (2022)), and conducts nationwide research (*e.g.*, Institute for Justice, *50 Shades of Government Immunity* (Jan. 25, 2022), https://ij.org/report/50-shades-of-government-immunity/) concerning government immunity doctrines.

Like many of these doctrines, qualified immunity's historical pedigree is suspect. Cutting-edge legal scholarship has identified fatal problems with the defense's justifications, exposing qualified immunity as both factually ahistorical and normatively unjustified. IJ aims to bring these issues to the Court's attention by providing

[1] No party's counsel authored any portion of this brief. No party or person—other than Amicus—contributed money intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief. *See* Fed R. App. P. 29(a)(2).

relevant history and showing why the Court should not expand qualified immunity to cover obvious, egregious constitutional violations like those at issue here.

## INTRODUCTION

The last time this case came up on appeal, Judge Eighmy asked the Court to expand judicial immunity to completely shield him from accountability for violating the constitutional rights of two children, Kadan and Brooklyn Rockett. The Court declined that invitation. *See Rockett v. Eighmy*, 71 F.4th 665, 672 (8th Cir. 2023) (*Rockett I*). Now, Judge Eighmy asks the Court to expand a different immunity doctrine—qualified immunity—to invalidate a jury verdict in the Rocketts' favor. Again, the Court should decline.

Cases like this one highlight the practical and jurisprudential perils of qualified immunity. Time and time again, defendants invoke the doctrine to escape accountability for egregious constitutional violations, so long as no identical case exists in a binding jurisdiction. Some courts allow this gambit to work. Others rightly see through it, finding instead that obvious constitutional abuses can be remedied without carbon-copy precedent presaging the exact violation at issue.

This second approach—the one this Court should follow—is more consistent with the Supreme Court's guidance that qualified immunity is inappropriate in the face of "particularly egregious facts[,]" *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (per

curiam), and obvious constitutional violations, *Hope v. Pelzer*, 536 U.S. 730, 741–42 (2002). Under *Taylor* and *Hope*, "[q]ualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional." *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023) (citing *Taylor*, 592 U.S. at 7–8); *see also Doe v. Aberdeen Sch. Dist.*, 42 F.4th 883, 892 (8th Cir. 2022) (explaining that qualified immunity is inappropriate when an official's "conduct is obviously unlawful, even in the absence of a case addressing the particular violation" (citation omitted)).

Here, a sitting judge personally descended from the bench, jailed two innocent children, and threatened to cast them into the foster care system if they did not do as he wished. Contents of the Federal Reporters aside, every reasonable judge would know that this violated the children's Fourth Amendment rights—it's obvious. Even worse, unlike a police officer forced to make a split-second decision in rapidly-evolving circumstances, Judge Eighmy had time to think. Yet he still chose to violate the Constitution. Below, the jury held Judge Eighmy accountable for his actions, and the district court upheld its decision. This Court should not superimpose qualified immunity at the last minute to undo this vindication of the Rocketts' rights.

More fundamentally, however, qualified immunity should not shield Judge Eighmy's actions because the doctrine is historically indefensible. Traditional accounts of qualified immunity's validity rest on the assumption that the doctrine arose out of the common law. But the modern version of qualified immunity, crafted by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), bears no resemblance to any common-law immunity doctrine to which government defendants may have been entitled. And the more limited defenses that *did* exist at common law were abrogated in 1871, when Congress passed 42 U.S.C. § 1983.

Indeed, the original text of § 1983 made clear that Congress enacted the statute to provide a remedy "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding." Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13; *see Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring) ("The language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—*notwithstanding* any state law to the contrary."). Although this "Notwithstanding Clause" is absent from today's § 1983, forthcoming scholarship shows that its omission was intentional and non-substantive. The Clause was removed as surplusage when what is now § 1983 was codified in 1874. As everyone knew at the time, codification "left Section 1983's meaning

unchanged." Patrick Jaicomo & Daniel Nelson, *Section 1983 (Still) Displaces Qualified Immunity*, 49 Harv. J.L. & Pub. Pol'y ___ (forthcoming 2026) (manuscript at 5), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5124275. As a result, § 1983 has always foreclosed the qualified immunity defense.

This Court is, of course, bound by precedent applying qualified immunity. But it is not bound to unnecessarily expand the doctrine in the face of its historical infirmity. The Court should therefore find that qualified immunity is not so broad as to shield a judge from accountability for such an obvious constitutional violation.

## ARGUMENT

### I. Qualified immunity does not shield officials from accountability for obvious constitutional violations.

Every reasonable American knows that a judge cannot shed his robe, personally put two children in jail, and threaten to permanently separate them from their parents for no good reason. Yet Judge Eighmy claims that he is entitled to qualified immunity because his decision to do just that "was so unusual that there is *no* case law . . . putting the constitutionality of [his] actions beyond debate." Eighmy Br. at 41. This argument is not new. Defendants in § 1983 cases have long tried to leverage the uniqueness of their constitutional violations to dissuade courts from holding them accountable. Sometimes they succeed. But as this Court and many of its sisters

have recognized, guidance from the Supreme Court—alongside common sense—makes clear that novelty alone cannot immunize an obvious constitutional violation.

### A. Circuits disagree about whether defendants may invoke qualified immunity to escape accountability for egregious constitutional violations.

The Supreme Court created qualified immunity in 1982 to shield government officials from liability if their actions did not violate "clearly established . . . rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.[2] So while the doctrine protects officials who reasonably believed their actions were constitutional, the Supreme Court has explained that qualified immunity is unavailable to "the plainly incompetent," "those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and those who commit obvious constitutional violations, *Hope*, 536 U.S. at 741–42. On the latter point, *Hope* instructs that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," even if the facts presented by prior cases do not perfectly foreshadow the facts presently before a court. *Id.* at 741 (citation omitted); *see also Taylor*, 592 U.S. at 9 (summarily reversing grant of qualified immunity in light

[2] Before *Harlow*, the Court created a good-faith immunity that applied in all § 1983 lawsuits. *See Pierson v. Ray*, 386 U.S. 547, 557 (1967). But modern qualified immunity doctrine took form when the Court traded *Pierson*'s subjective good-faith standard for *Harlow*'s objective clearly-established-law test. *See* Part II.A, *infra*.

of "particularly egregious facts"); *Sause v. Bauer*, 585 U.S. 957, 959 (2018) (summarily reversing grant of qualified immunity to officers who ordered a woman to stop praying because "[t]here can be no doubt that the First Amendment protects the right to pray").

Still, despite the Supreme Court's repeated admonitions, some courts extend qualified immunity to officials whose actions were plainly incompetent, knowingly illegal, or obviously unconstitutional. *See generally* Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity*, J. Crim. L. & Criminology 105, 127–28 (2022) (collecting cases). To offer an example, in *Villarreal v. City of Laredo*, the en banc Fifth Circuit granted qualified immunity to city officials who, after plotting for six months, arrested a citizen journalist who was critical of law enforcement for asking a police officer to corroborate information for two developing stories. 94 F.4th 374, 397 (5th Cir. 2024) (en banc) (*Villarreal I*), *vacated sub nom. Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). In doing so, the court rejected the journalist's argument that her arrest—motivated by viewpoint discrimination—obviously violated the First Amendment. *Villarreal I*, 94 F.4th at 390–94. And because no binding case held that it was unconstitutional to arrest a journalist under the specific Texas statute the city officials relied on, the Fifth Circuit found that qualified immunity applied. *Id.* at 395.

Dissenting, Judge Ho explained: "The Supreme Court has made clear that public officials who commit obvious constitutional violations are not entitled to qualified immunity." *Id.* at 413 (citing *Hope*, 536 U.S. at 741; *Taylor*, 592 U.S. at 9). And the obvious unconstitutionality of arresting a journalist for asking questions, Judge Ho found, "should be devastating to [the city officials'] claim of qualified immunity." *Id.*

The Supreme Court vacated the Fifth Circuit's decision after the journalist appealed, but the circuit reaffirmed dismissal on remand—this time, without addressing obviousness. *See Villarreal v. City of Laredo*, 134 F.4th 273, 275–76 (5th Cir. 2025) (*Villarreal II*). Although he agreed that binding precedent mandated dismissal this time around, Judge Oldham wrote a separate opinion suggesting that "the absence of split-second decision-making" makes otherwise obvious constitutional violations even less deserving of qualified immunity. *Id.* at 284 (Oldham, J., concurring). Still, as Judge Ho has discussed, the Fifth Circuit has a ways to go before it fully embraces the Supreme Court's obviousness doctrine. *See McMurry v. Weaver*, 142 F.4th 292, 304 (5th Cir. 2025) (Ho, J., concurring) (remarking that "it's profoundly disquieting" that invoking qualified immunity for obvious constitutional violations "finds so much support in [the Fifth Circuit's] precedents").

Other courts—including this one—have taken the Supreme Court's guidance to heart, eschewing the notion that qualified immunity can only be defeated by a hyper-specific factual analogue. This Court has recognized that "an official may have fair notice" that he is violating clearly-established law "based on the fact that his conduct is obviously unlawful, even in the absence of a case addressing the particular violation." *Doe*, 42 F.4th at 892 (cleaned up). This makes sense. As then-Judge Gorsuch explained, "sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015).

Relying on *Hope*, this Court and others have denied qualified immunity in Fourth Amendment cases that rhyme with this one. *See, e.g.*, *Doe*, 42 F.4th at 892 (applying *Hope* to children's claim that they were secluded and abused by their teacher); *Schneyder v. Smith*, 653 F.3d 313, 331 (3d Cir. 2011) (applying *Hope* to material witness's claim that a prosecutor caused her to be detained without valid judicial authorization); *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017) (applying *Hope* to child's claim that social workers used perjured testimony to remove the child from her mother's care); *Halley v. Huckaby*, 902 F.3d 1136, 1148–49 (10th Cir. 2018) (applying *Hope* to children's claim that they were seized at school without adequate justification by a deputy and a state employee); *Gray ex rel.*

*Alexander v. Bostic*, 458 F.3d 1295, 1307 (11th Cir. 2006) (holding that a school resource officer who handcuffed a nine-year-old child as punishment for threatening a gym teacher obviously violated the Fourth Amendment). As these examples show, courts that take *Hope* and its progeny seriously have no trouble denying qualified immunity when officers act "recklessly and deliberately in violation of [] constitutional rights." *Rosales*, 72 F.4th at 1157.

### B. This Court should not expand qualified immunity to shield Judge Eighmy's obviously unconstitutional actions.

This case presents quintessentially unconstitutional conduct. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Absent a warrant or an exception to the warrant requirement, then, "searches and seizures conducted outside the judicial process . . . are *per se* unreasonable." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up); *accord Peterson v. City of Plymouth*, 945 F.2d 1416, 1420 (8th Cir. 1991) (denying qualified immunity to officers who detained innocent person in the back of a squad car for 20 minutes without reasonable suspicion that he committed a crime). And when officers effectuate a seizure, their "subjective motivations . . . ha[ve] no bearing on whether [that] seizure is 'unreasonable' under the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

These rules "apply with obvious clarity to" Judge Eighmy's conduct. *Hope*, 536 U.S. at 741. After settling the custody dispute between the Rocketts' parents, Judge Eighmy took off his robe, exited the courtroom, and injected himself into a disagreement between the children and their mother about whether they would leave the courthouse with her. TT 76:12–77:11, 183:11–20, 184:12–21. When the Rocketts stood their ground, Judge Eighmy escorted them to the Juvenile Office, where the children were forced to remove some of their clothing and sit in separate jail cells for approximately an hour. TT 84:5-22, 96:1–4, 196:17–197:2, 97:11–13, 197:14–18. Judge Eighmy eventually returned, and the children relented—but only after he threatened to toss them into foster care, where they would never see their family again. TT 104:14–25, 105:21–106:1, 199:21–200:3.

The children were never suspected of committing a crime. Judge Eighmy never initiated contempt proceedings against them. And the children were not free to leave their jail cells until they agreed to Judge Eighmy's terms. Instead, Judge Eighmy leveraged his position of state authority to circumvent the very legal process he was charged with administering, detaining two innocent minors because he was unhappy with their reaction to being stuck in the middle of an acrimonious custody dispute. Every reasonable judge—every reasonable American—would know that

this extrajudicial detention violated the Fourth Amendment. Indeed, that is exactly what the jury concluded below.[3]

Qualified immunity is particularly inappropriate here because Judge Eighmy's obviously unconstitutional conduct was not "compelled by necessity or exigency." *Taylor*, 592 U.S. at 9. Judge Eighmy was not forced to make a split-second decision in a high-risk situation. Instead, he had time to deliberate before injecting himself into a private disagreement between two children and their mother, throwing the children in jail, and threatening to forever separate them from their loved ones unless they agreed to his demands. In other words, Judge Eighmy had "plenty of time to assess [his] horrific conduct and recognize that it obviously violated the law." *Villarreal II*, 134 F.4th at 284 (Oldham, J., concurring).

To extend qualified immunity to Judge Eighmy's actions would be to adopt the "remarkable" position that "the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Browder*, 787 F.3d at 1082–83 (Gorsuch, J.). This Court should chart a better path.

---

[3] Add to all this the fact that judges have no authority to "do double duty as jailers[,]" *Rockett I*, 71 F.4th at 672, and the unconstitutionality of Judge Eighmy's actions becomes even more apparent, *see Johnson v. Phillips*, 664 F.3d 232, 239 (8th Cir. 2011) (denying qualified immunity to officer who acted beyond the scope of his discretionary authority when he illegally searched the trunk of a car).

## II. Qualified immunity is indefensible as a matter of legal history.

Obviousness of his constitutional violations aside, Judge Eighmy is not entitled to qualified immunity because § 1983 has never allowed the defense to begin with. Although qualified immunity allegedly has its roots in the common law, modern qualified immunity doctrine would be unrecognizable to every jurist alive at the founding. And any defense that resembled qualified immunity was abrogated when Congress passed the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983.

During the codification process, Congress removed language from the original text of what is now § 1983. That language, the Notwithstanding Clause, provides additional evidence that Congress never intended for qualified immunity to exist. And as forthcoming scholarship has uncovered, Congress's decision to omit the Notwithstanding Clause was unanimously understood to be a necessary word-cutting measure, not a material change to the statute. In sum, § 1983 precludes qualified immunity today—just as it always has.

### A. Qualified immunity did not exist at common law.

To overcome qualified immunity, plaintiffs must prove that the defendant's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. According to the Supreme Court, this clearly-established-law requirement finds its roots in a good-faith defense available to public employees at the founding. *Id.* at 807 (invoking the

common law). "At common law," the Court has explained, "government actors were afforded certain protections from liability, based on the reasoning that 'the public good can best be secured by allowing officers charged with the duty of deciding upon the rights of others, to act upon their own free, unbiased convictions, uninfluenced by any apprehensions.'" *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting *Wasson v. Mitchell*, 18 Iowa 153, 155–56 (1864)). And because § 1983 does not expressly abrogate the good-faith immunity that existed in 1871, the argument goes, qualified immunity's historical pedigree remains intact. *Id.*; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993).

There is one problem with this account: It's wrong. As legal scholarship has uncovered, "there was no well-established, good-faith defense in suits about constitutional violations when Section 1983 was enacted, nor in Section 1983 suits early after its enactment." William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55 (2018). Quite the opposite. At the founding, American courts adopted the English tradition of strict liability for violations of fundamental rights, awarding money damages against the officer responsible. Jaicomo & Bidwell, *supra*, at 112–13. The courts countenanced no exceptions—"[i]f a public official violated the law, he was answerable in damages" despite his "reasonableness or good faith." *Id.* at 113. This approach could be harsh, but it was grounded in the ultimate concern that the

violation of any right must have a corresponding remedy.[4] *See* David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 19 (1972).

The Supreme Court's decision in *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), is perhaps the best example of early-American practice. In *Little*, a Navy captain seized a Danish ship sailing away from a French port. *Id.* at 178. The seizure had been ordered by President John Adams, but the president's instruction was based on a mistake in the law: A federal statute allowed the seizure of boats heading *toward* French ports, not returning *from* them. *Id.* at 176–78. So although the seizure was made in good-faith reliance on direct orders from the president, it was nevertheless illegal. *Id.*

The ship's owner sued the captain, seeking damages and the return of his vessel. *Id.* at 176. On appeal, the Supreme Court sided with the owner. In no uncertain terms, the Court explained that even an officer executing the president's direct orders "acts at his peril." *Id.* at 170. Although Chief Justice Marshall confessed that his "first bias" was to absolve the captain of liability because of his good-faith

[4] Although individual officers were personally liable for constitutional violations at the founding, Congress often indemnified them if it found that they "acted in good faith and without malice" or merely followed a superior's instructions. Jaicomo & Bidwell, *supra*, at 117.

reliance on the president's instructions, the Court concluded that good faith alone cannot "legalize an act which without those instructions would have been a plain trespass." *Id.* at 179. This strict-liability regime for constitutional violations[5] largely persisted throughout the nineteenth century. *See* Baude, *supra*, at 56–57; Max P. Rapacz, *Protection of Officers Who Act Under Unconstitutional Statutes*, 11 Minn. L. Rev. 585, 585 (1927) ("Prior to 1880 there seems to have been absolute uniformity in holding officers liable for injuries resulting from the enforcement of unconstitutional acts.").

This is not to say that officials in early-American history were completely defenseless in all suits against them. As the Supreme Court noted in *Filarsky*, officials could sometimes defeat common-law causes of action (but not constitutional causes of action) by showing that they acted in good faith. 566 U.S. at 383, 388–90; *see also* Baude, *supra*, at 58 (noting that the Supreme Court's justifications for qualified immunity do not reference any historical good-faith exception for constitutional claims). But when a good-faith defense *was* available, it almost always arose out of the elements of the common-law tort itself—not from any free-floating immunity

---

[5] As Professor Baude explains, the Court in *Little* "refers to the seizure as 'unlawful' rather than specifically 'unconstitutional,' though it certainly seems as though an unlawful seizure of a ship would have violated either the Fourth or Fifth Amendments (more likely the Fifth)." *Baude*, *supra*, at 56 n.51.

from suit. *See* Baude, *supra*, at 59 ("[B]ad faith and flagrancy were simply elements of certain torts brought against public officials. It did not follow that they were elements of all torts or all constitutional claims against public officials."). So while an officer's good faith could offer a potent defense against a fraud claim, for instance, there is no evidence to suggest it barred mine-run constitutional lawsuits.

Qualified immunity bears no resemblance to this early-American practice. Even before *Harlow*, the Supreme Court eschewed the founding-era strict-liability regime and replaced it with a drastically expanded good-faith immunity that applied across the board. *See Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("[T]he defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983."). With this move, the Court transformed the tort-specific defense of good faith that existed at common law into an ever-present hurdle that plaintiffs had to clear no matter "the precise character of the particular rights" at issue. *Anderson v. Creighton*, 483 U.S. 635, 642–43 (1987). This "major shift in the jurisprudence" was unjustified on its own terms, Jaicomo & Bidwell, *supra*, at 122, but it had at least some claim to legitimacy because it bore a (tenuous) connection to bona fide common-law defenses applicable in non-constitutional lawsuits.

*Harlow* binned the common law altogether. Its clearly-established-law requirement abandoned *Pierson*'s "subjective inquiry into intent or motive" in favor of the clearly-established-law test. Baude, *supra*, at 60. Unlike the expanded good-faith defense in *Pierson*, however, this test is completely untethered from any early-American practice. *See* Jaicomo & Bidwell, *supra*, at 125 ("Through *Harlow*, the Court erased two centuries of case law that consistently held government officials liable for their unlawful acts."). It should come as no surprise, then, that jurists and academics alike reject the notion that qualified immunity has legitimate common-law ancestry. *See, e.g.*, *Rogers*, 63 F.4th at 980 (Willett, J., concurring) ("[T]he Supreme Court's original justification for qualified immunity . . . is faulty[.]"); *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) (collecting opinions and scholarship); Baude, *supra*, at 77 ("The real problem with qualified immunity is that it is so far removed from ordinary principles of legal interpretation."); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 204 (2023) ("The methodology the Court used to create the doctrine . . . was never [] legitimate[.]").

Some justices have acknowledged this problem. *See, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 611 (1988) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under § 1983 has not purported to be faithful to the common-law

immunities that existed when § 1983 was enacted[.]"); *Ziglar v. Abbasi*, 582 U.S. 120, 158 (2017) (Thomas, J., concurring in part) ("In further elaborating the doctrine of qualified immunity for executive officials, however, we have diverged from the historical inquiry mandated by the statute."). Aware that it cannot full-throatedly defend qualified immunity's historical pedigree, the Supreme Court invokes policy concerns to protect its creation. *See, e.g.*, *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) ("[T]he reasons for recognizing such an immunity were based not simply on the existence of a good faith defense at common law, but on the special policy concerns involved in suing government officials."). At the same time, however, the Court acknowledges that it does "not have a license to create immunities based solely on [its] view of sound policy[.]" *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012).

So what gives? On the one hand, the Court claims that qualified immunity is justified by common-law analogues, but no analogue ever existed. On the other, the Court claims that qualified immunity arose out of special policy concerns, but policy concerns are not a legitimate reason to create governmental immunities. Two possibilities arise: Either the *Harlow* Court made a historical mistake grounding qualified immunity in good-faith defenses available at common law, or it simply made improper policy. *Cf. Wyatt*, 504 U.S. at 171 (Kennedy, J., concurring) (noting that "the

Court in *Harlow* [] depart[ed] from history in the name of public policy"). Neither possibility justifies the doctrine's continued existence.

### B. Section 1983's Notwithstanding Clause confirms that the statute abrogates any state common-law immunities that applied before its enactment.

As discussed above, no robust, free-floating immunity from suit was available to government officials before Congress enacted the Civil Rights Act of 1871. But even the limited defenses that *did* exist at the time were abrogated by the Act's passage. The Act's original text included language—the "Notwithstanding Clause"—that explicitly displaced any common-law rule that hindered its operation:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, **any such law, statute, ordinance, regulation, custom or usage of the State to the contrary notwithstanding**, be liable to the party injured . . . .

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (Notwithstanding Clause bolded). The implications of this language "are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983." Reinert, *supra*, at 236; *cf. Price v. Montgomery County*, 144 S. Ct. 2499, 2500 n.2 (2024) (Sotomayor, J., respecting the denial of certiorari) (noting that absolute prosecutorial immunity "should be employed sparingly" given the Notwithstanding Clause).

The Notwithstanding Clause confirms that § 1983 displaces state-law immunities, but scholars agree that the Clause was not necessary to preclude *qualified* immunity—that defense never existed to begin with. *See* Part II.A, *supra*; Reinert, *supra*, at 234; Jaicomo & Nelson, *supra*, at 6 n.14. Why, then, did Congress include the Notwithstanding Clause in the Civil Rights Act of 1871? As it turns out, "[n]otwithstanding clauses were 'ubiquitous' in early American and English law." Jaicomo & Nelson, *supra*, at 11. Drafters included them to combat the once-relevant canon that new statutes should not be read in derogation of the common law. *Id.* at 16. When that canon was at its zenith, legislatures were wise to include a notwithstanding clause in any law that *was* intended to abrogate common-law rules that posed a threat to its operation. *Id.*

By the time Reconstruction rolled around, the anti-derogation cannon had fallen out of favor.[6] *See id.* at 15 (noting that, by the mid-1800s, courts routinely recognized that the plain text of a statute was enough to displace inconsistent prior law); Reinert, *supra*, at 228 (explaining that the Reconstruction Congress would not have expected the anti-derogation canon to apply to § 1983). As courts embraced

[6] Even if the anti-derogation canon still had force when Congress enacted § 1983, it should have no bearing on the statute's sweep—the Supreme Court never understood the canon to "incorporate common law defenses into new statutory causes of action, absent express legislative direction to the contrary." Reinert, *supra*, at 228.

legislative supremacy, everyday textualism came to serve the function that notwithstanding clauses once did. Jaicomo & Nelson, *supra*, at 15. Yet Congress saw fit to include the Notwithstanding Clause in § 1983 as a "'fail-safe' redundancy" to ensure that the statute would have its intended effect. *Id.* at 36 (footnote omitted).

The legislature's concern was understandable. Congress worried that, in the "fiercely resistant postbellum South," nothing short of a wholesale repudiation of contrary state law would ensure that § 1983 meaningfully protected the constitutional rights of newly freed Black citizens. *See id.* at 36–38, 45 (cataloguing the state sanctioned, racially motivated, and legally unpunished violence Congress intended to remedy by passing § 1983); Reinert, *supra*, at 239 ("[S]upporters of the Civil Rights Act did not trust state courts to protect constitutional rights."). So the legislature included the Notwithstanding Clause to "reinforce[] the ordinary meaning of the statute's text," which by its own terms made "any person" liable for violating the Constitution under color of state law. Jaicomo & Nelson, *supra*, at 40.

Against this backdrop, it makes little sense to suppose that Congress tacitly smuggled into § 1983 preexisting state-law immunities that would frustrate the statute's operation. Or that the Reconstruction Congress would hand such a tool to the very state officials it was trying to rein in. It makes even less sense to imagine that Congress smuggled in *Harlow*'s clearly-established-law test. That test—which

would have been foreign to the legislature—eviscerates the cause of action Congress created.

Indeed, Congressmen who opposed the Civil Rights Act of 1871 did not believe that the Act preserved the limited state-law immunities that existed at the time. As a result, they tried to block § 1983's passage. *See* Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741, 771 (1987). Congressional debates from that time "are replete with statements of the opponents . . . that the legislation was overriding [state] immunities[,]" yet "nothing in the legislative history is said to assuage the fears of these opponents." *Id.* In other words, the members of Congress who opposed Reconstruction feared that § 1983 means what it says: Those who violate the Constitution under color of state law shall be liable. The Notwithstanding Clause confirms that their fears were justified.

Despite the Notwithstanding Clause's eventual omission from § 1983, discussed below, the Supreme Court has quoted or discussed it at least 11 times, including as far back as 1883. *See* Jaicomo & Nelson, *supra*, at 4 n.6 (collecting cases). It should therefore come as no surprise that, "after Section 1983 was enacted, the [Supreme] Court specifically rejected the application of a good-faith defense to constitutional suits under that specific statute." Baude, *supra*, at 57 (citing *Myers v.*

*Anderson*, 238 U.S. 368, 378–79 (1915)). Indeed, the strict-liability "logic of founding-era cases" was "alive and well in the federal courts" for decades after § 1983's enactment. *Id.* at 58. The Supreme Court's departure from this logic—which began in *Pierson* and metastasized in *Harlow*—ignores text and history alike. *See* Reinert, *supra*, at 244 (noting that the Court "has entirely failed to grapple with the Civil Rights Act's enacted text").

### C. Congress's decision to remove the Notwithstanding Clause did not change the meaning of § 1983.

Of course, if a law student cracked open a copy of the U.S. Code today, she would not find the Notwithstanding Clause in the text of § 1983. That's because Congress struck the Clause from the books during the first codification of federal laws in 1874, just three years after § 1983's passage. *See* Jaicomo & Nelson, *supra*, at 56.

Until recently, observers were unsure what to make of this revision. *See, e.g.*, Reinert, *supra*, at 207 (claiming that the Clause was removed "[f]or reasons unknown," likely in "error"). So while the Clause certainly offers textual evidence of Congress's intent in passing § 1983, *id.* at 237, the practical implications of its removal have remained a question, *compare* 74 Rev. Stat. § 5596 (1874) ("All acts of Congress passed prior [to the Revised Statutes of 1874,] any portion of which is embraced in any section of said revision, are hereby repealed[.]"), *with U.S. Nat'l Bank*

*of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, it is the Statutes at Large that provides the legal evidence of laws." (cleaned up)).

Forthcoming scholarship, however, has uncovered answers. The overwhelming weight of evidence suggests that Congress *intended* to remove the Notwithstanding Clause during codification precisely because doing so made *no substantive change* to § 1983. *See* Jaicomo & Nelson, *supra*, at 57–67. To understand why, it is important to address the monumental task of codification. Before 1874, jurists could not easily reference all enacted federal laws; they "had to painstakingly sort through a mess of seventeen volumes of congressional acts just to figure out what the law was." *Id.* at 57. This system became untenable, so in 1866, Congress passed a law instructing a three-lawyer commission (the Revisers) to "revise, simplify, arrange, and consolidate" the scattered acts into a single bill that would repeal and replace all federal law at once. Act of June 27, 1866, ch. 140, § 1, 14 Stat. 74.

The codification process was as burdensome as it sounds. It took eight years, the intervention of an additional Reviser, and many late-night House sessions before the job was done. Jaicomo & Nelson, *supra*, at 58–59. All the while, though, the objective stayed consistent: "strike out the obsolete parts and [] condense and

consolidate" without "chang[ing] the law . . . so as to make a different reading or a different sense." 2 Cong. Rec., 43d Cong., 1st Sess. 129 (1873) (statement of Rep. Butler). This objective—concision without substantive alteration—was emphasized "at every step of the process." Jaicomo & Nelson, *supra*, at 60. And with the anti-derogation canon having been replaced by a move toward legislative supremacy and textualism, notwithstanding clauses "were low-hanging fruit" that codifiers could remove without worrying about accidentally changing the law. *Id.* at 30. For these reasons, Congress pruned Section 1983's Notwithstanding Clause (alongside other notwithstanding clauses in different federal acts), just as states had done when codifying their own laws. *See id.* at 30, 62, 65.

The Supreme Court understood the Revisers' mission. The Court explained that it would not "infer[] that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." *United States v. Ryder*, 110 U.S. 729, 740 (1884). Indeed, just ten years after codification, the Court found that Congress's decision to remove notwithstanding clauses in Reconstruction-era civil-rights statutes did not alter their meaning. *See Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). In the *Civil Rights Cases*, the Court explained that the "very important" notwithstanding clause in § 1982 had been included in the original text of the Civil Rights Act of 1866 to underscore its "point and effect." *Id.* at 16. And

even though § 1982's notwithstanding clause did not survive codification, the Court understood that this removal did not alter "the effective part of the law . . . thus preserving the corrective character of the legislation." *Id.* at 17; *see also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 n.29 (1968) (describing the removal of § 1982's notwithstanding clause as "immaterial"). Given the similar language Congress employed in § 1982 and § 1983 (and the similar purpose behind each enactment), there is no reason to believe that the Court saw the removal of the latter statute's Notwithstanding Clause differently.

In sum, although the Notwithstanding Clause is absent from § 1983 as codified, its omission does not change the statute's meaning. "The Revisers deliberately removed the Notwithstanding Clause to simplify and condense Section 1983, just as codifiers before them had long done." Jaicomo & Nelson, *supra*, at 67. The Revisers, Congress, and the Supreme Court all understood that § 1983's codified text was strong enough to "supersede the discriminatory state law still rampant in the post-war South" on its own. *Id.* at 69. No constitutional or statutory intervention has ever prevented § 1983 from displacing immunities that impede its operation—least of all qualified immunity.

*  *  *

Qualified immunity has no claim to its stranglehold on § 1983 litigation. The doctrine supposedly has its roots in the common law, but upon investigation, early-American courts imposed a rule of strict liability against officials who violated the Constitution. The state-law defenses that did exist at the time were based on the elements of individual torts, did not apply in constitutional cases, and offered nothing resembling *Harlow*'s free-floating immunity from suit. But even if they had, the passage of § 1983 abrogated them. This is clear from the text of the statute as codified, but it's made clearer by Congress's decision to include the Notwithstanding Clause in the Civil Rights Act of 1871. And as forthcoming scholarship shows, Congress's decision to remove the Clause just three years later did no violence to § 1983—as everyone at the time understood. This unbroken line of legal authority stretching from the founding to today exposes qualified immunity as practically unjustified and historically unjustifiable.

## CONCLUSION

In the full light of day, it is difficult to attribute qualified immunity's continued existence to anything but unwarranted inertia. This Court must, of course, "faithfully apply Supreme Court precedent." *United States v. Cline*, 27 F.4th 613, 622 (8th Cir. 2022) (Stras, J., concurring in the judgment). But it need not extend precedent

that rests on such shaky footing. Given the obvious, outrageous constitutional violations perpetrated against the Rocketts, this Court should firmly reject qualified immunity's application here.

Dated: July 29, 2025.

Respectfully submitted,

/s/ Dylan Moore

Dylan Moore
Anya Bidwell
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9329
dmoore@ij.org
abidwell@ij.org
pjaicomo@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was filed electronically on July 29, 2025, and thus, will be served electronically upon all counsel. I further certify that, upon this brief being file-accepted, one paper copy will be served on counsel for each party by commercial carrier under Local Rule 28A(d) and Federal Rule of Appellate Procedure 25(c)(1)(C).

/s/ Dylan Moore
Dylan Moore

*Counsel for Amicus Curiae*
*Institute for Justice*

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(g), I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,483 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) because this brief has been prepared using Microsoft Office Word and is set in Equity A font in a size equivalent to 14 points or larger.

3. The undersigned attorney certifies that this brief has been scanned for viruses. To the best of our ability and technology, we believe this brief to be virus free.

/s/ Dylan Moore
Dylan Moore

*Counsel for Amicus Curiae*
*Institute for Justice*